# 22-366

## In the United States Court of Appeals for the Second Circuit

---

SOLID 21, INC.,
PLAINTIFF-COUNTER DEFENDANT-APPELLANT,

*v.*

BREITLING USA, INC., BREITLING SA,
DEFENDANTS-COUNTER CLAIMANTS-APPELLEES

BREITLING AG,
DEFENDANT-APPELLEE,

CVC CAPITAL PARTNERS SICAV-FIS, S.A.,
DEFENDANT.

---

*ON APPEAL FROM THE UNITED STATES DISTRICT COURT*
*FOR THE DISTRICT OF CONNECTICUT*
*(THE HONORABLE MICHAEL P. SHEA)*

---

**BRIEF OF APPELLANT SOLID 21, INC.**

---

DAVID L. HECHT
YI WEN WU
HECHT PARTNERS LLP
*125 Park Avenue, 25th Floor*
*New York, NY 10017*
*(212) 851-6821*

LISA S. BLATT
AMY MASON SAHARIA
WILLIAMS & CONNOLLY LLP
*680 Maine Avenue, S.W.*
*Washington, DC 20024*
*(202) 434-5000*
*asaharia@wc.com*

## CORPORATE DISCLOSURE STATEMENT

Appellant Solid 21, Inc., has no parent corporation, and no publicly held company owns 10% or more of its stock.

# TABLE OF CONTENTS

Page

STATEMENT OF JURISDICTION ....................................................1

STATEMENT OF THE ISSUE ...........................................................1

STATEMENT OF THE CASE ............................................................1

    A.    Statutory Background ...............................................4

    B.    Factual Background ...................................................9

    C.    Procedural History ..................................................17

SUMMARY OF ARGUMENT ..........................................................24

STANDARD OF REVIEW ...............................................................27

ARGUMENT .....................................................................................27

I.    GENUINE DISPUTES OF FACT REMAIN ON WHETHER
BREITLING USED "RED GOLD" IN A DESCRIPTIVE
SENSE ....................................................................................29

II.    GENUINE DISPUTES OF FACT REMAIN ON WHETHER
BREITLING ACTED IN GOOD FAITH.............................41

III.    GENUINE DISPUTES OF FACT REMAIN ON WHETHER
BREITLING USED "RED GOLD" AS A MARK ...............48

CONCLUSION...................................................................................54

STATUTORY ADDENDUM ...........................................................1a

# TABLE OF AUTHORITIES

Page

## CASES

*Abercrombie & Fitch Co. v. Hunting World, Inc.*,
537 F.2d 4 (2d Cir. 1976) ...................................................30

*B & L Sales Assocs. v. H. Daroff & Sons, Inc.*,
421 F.2d 352 (2d Cir. 1970) ...............................................31

*Blisscraft of Hollywood v. United Plastics Co.*,
294 F.2d 694 (2d Cir. 1961) ........................................30, 38

*Car-Freshner Corp. v. S.C. Johnson & Son, Inc.*,
70 F.3d 267 (2d Cir. 1995) ................................................49

*Cosmetically Sealed Indus., Inc. v. Chesebrough-Pond's USA Co.*,
125 F.3d 28 (2d Cir. 1997) ..........................................*passim*

*EMI Catalogue P'ship v. Hill, Holliday, Connors, Cosmopulos Inc.*,
228 F.3d 56 (2d Cir. 2000) ..........................................*passim*

*Fortune Dynamic, Inc. v. Victoria's Secret Stores Brand Mgmt., Inc.*,
618 F.3d 1025 (9th Cir. 2010).........................28, 31, 40, 42

*Gruner + Jahr USA Publ'g v. Meredith Corp.*,
991 F.2d 1072 (2d Cir. 1993) .............................................7

*Inst. for Sci. Info., Inc. v. Gordon & Breach, Sci. Publishers, Inc.*,
931 F.2d 1002 (3d Cir. 1991) .......................................43, 47

*JA Apparel Corp. v. Abboud*, 568 F.3d 390 (2d Cir. 2009) ...................28, 48, 49

*Jones v. County of Suffolk*, 936 F.3d 108 (2d Cir. 2019)..................................27

*Kelly-Brown v. Winfrey*, 717 F.3d 295 (2d Cir. 2013) .............................*passim*

*KP Permanent Make-Up, Inc. v. Lasting Impression I, Inc.*,
543 U.S. 111 (2004)......................................................27, 42

*Park 'N Fly, Inc. v. Dollar Park & Fly, Inc.*, 469 U.S. 189 (1985) ...............6, 7

Cases—continued:

*Pub. Impact, LLC v. Bos. Consulting Grp. Inc.*,
169 F. Supp. 3d 278 (D. Mass. 2016)..............................................52

*Sierra On-Line, Inc. v. Phx. Software, Inc.*,
739 F.2d 1415 (9th Cir. 1984).......................................................43

*Solid 21, Inc. v. Breitling USA, Inc.*, 512 F. App'x 685 (9th Cir. 2013) ..........17

*Solid 21, Inc. v. Hublot of Am.*, 109 F. Supp. 3d 1313 (C.D. Cal. 2015)...........18

*Solid 21, Inc. v. Hublot of Am.*, 685 F. App'x 530 (9th Cir. 2017) ....................18

*Sports Auth., Inc. v. Prime Hosp. Corp.*, 89 F.3d 955 (2d Cir. 1996) ........42, 46

*TCPIP Holding Co., Inc. v. Haar Commc'ns Inc.*,
244 F.3d 88 (2d Cir. 2001) .......................................................50, 52

*Tiffany & Co. v. Costco Wholesale Corp.*, 971 F.3d 74 (2d Cir. 2020).....*passim*

*Time, Inc. v. Petersen Publ'g Co. L.L.C.*, 173 F.3d 113 (2d Cir. 1999) ..............8

*U.S. Pat. & Trademark Off. v. Booking.com B.V.*, 140 S. Ct. 2298 (2020)....5, 6

**STATUTES**

Lanham Act, 15 U.S.C. § 1051 *et seq.* ........................................*passim*
§ 1052..............................................................................5
§ 1052(d)..........................................................................6
§ 1052(f)...........................................................................6
§ 1057(b)..........................................................................6
§ 1057(c)...........................................................................6
§ 1065...........................................................................7, 10
§ 1065(4)..........................................................................7
§ 1091..............................................................................5
§ 1091(a)..........................................................................6
§ 1114.............................................................................18
§ 1114(1)..........................................................................7
§ 1115(b)(4) ...............................................................1, 2, 8, 27

Statutes—continued:

Lanham Act, 15 U.S.C. § 1051 *et seq.*—continued:
    § 1124 ..............................................................................6
    § 1125(a) .....................................................................7, 19
    § 1125(c) ........................................................................19
    § 1127............................................................................5

28 U.S.C.
    § 1291 ............................................................................1
    § 1331 ............................................................................1
    § 1338 ............................................................................1
    § 1367(a) .......................................................................1

Conn. Gen. Stat. Ann.
    § 35-11i .......................................................................19
    § 42-110b .....................................................................19

## OTHER AUTHORITIES

Breitling USA, *Partnership*, https://bit.ly/3GEk0SK .......................................48

H.R. Rep. No. 79-219 (1945) ........................................................................4, 5

2 J. Thomas McCarthy, *McCarthy On Trademarks*
    (5th ed. 2017) ............................................................................................46

Mfonobong Nsehe, *Meet Chris Aire, the King of Bling and Jeweler to*
    *Hollywood's Elite*, Forbes (Apr. 13, 2015), https://bit.ly/3taaO36 ..........9, 13

Restatement (Third) of Unfair Competition (1995) ....................................30, 32

Solid 21, Inc., *Aire Parlay Automatic GMT Swiss Made 18 Karat*
    *Solid Gold Rare Watch – Red Gold®*, https://bit.ly/3GVMVlD ...................9

Solid 21, Inc., *Signature RED GOLD® Collection*,
    https://bit.ly/3x52yCu ...............................................................................1

Solid 21, Inc., *The Story Behind Chris Aire*, https://bit.ly/397TAMK .............9

Other Authorities—continued:

USPTO, *Office Action on Trademark Application Serial No. 88263031* (July 7, 2021), https://bit.ly/3x7Uouk............................................................20

**STATEMENT OF JURISDICTION**

The district court had jurisdiction under 28 U.S.C. §§ 1331, 1338, and 1367(a). The district court entered final judgment on January 27, 2022. JA-4751. Appellant Solid 21, Inc. filed a timely notice of appeal on February 23, 2022. JA-4753. This Court has jurisdiction under 28 U.S.C. § 1291.

**STATEMENT OF THE ISSUE**

Whether the district court erred in granting, on defendants' motion for reconsideration, summary judgment to defendants on Solid 21's trademark-infringement and unfair-competition claims based on the affirmative defense of fair use under 15 U.S.C. § 1115(b)(4).

**STATEMENT OF THE CASE**

Chris Aire, the founder and owner of plaintiff-appellant Solid 21, Inc., built a luxury watch and jewelry business around his federally registered trademark RED GOLD®. *See* Solid 21, Inc., *Signature RED GOLD® Collection*, https://bit.ly/3x52yCu. Aire envisioned the RED GOLD® brand, which he launched thirty years ago in 1989, as appealing to masculinity. His vision was pure genius. The RED GOLD® brand attracted high-end jewelry and watch customers, including professional athletes and male celebrities such as Michael Jordan and Muhammad Ali, but also others such as Ellen DeGeneres and Halle Berry. Over time, Aire accumulated significant goodwill in the RED

1

GOLD® mark, which became synonymous with his business and brand. Absent reversal, the decision below would destroy that goodwill by permitting Aire's competitors to appropriate his mark at will.

Defendant-appellee Breitling, founded in 1884, is a luxury watch manufacturer and thus competes against Solid 21 in the luxury watch market. In the proceedings below, Breitling did not show that it ever used the term "Red Gold" to market its watches in the first 125 years of its existence—before Solid 21's use. That fact is unsurprising: the relevant consuming public does not understand the phrase "Red Gold" to describe anything—unlike, say, "rose gold" or "white gold." Breitling first started marketing its watches with the phrase "Red Gold" in approximately 2010, long after Aire successfully developed his RED GOLD® mark. Since then, Breitling has marketed "Red Gold" watches across myriad marketing platforms, including print advertisements, website advertising, and social media. Confusion resulted.

Solid 21 sued Breitling under the Lanham Act for trademark infringement and related claims. At summary judgment, Breitling invoked the affirmative defense of fair use, claiming that it used the phrase "Red Gold" other than as a mark, descriptively, and in good faith. *See* 15 U.S.C. § 1115(b)(4). Initially, the district court held that genuine issues of disputed fact on the

elements of descriptive use and good faith precluded summary judgment. But the court reversed itself on Breitling's motion for reconsideration. On the issue of Breitling's descriptive use, the court held that it had previously erred in treating as "dispositive" the availability of alternative terms, such as "rose gold," to describe Breitling's watches. And in holding that Breitling met its burden of showing good faith, the court reasoned that Solid 21 did not show that Breitling was familiar with the RED GOLD® mark before Breitling started using it in 2010.

The decision below stretches the fair-use defense beyond recognition and improperly resolves factual disputes in Breitling's favor. Whether a defendant had adequate alternative terms to describe its product is *always* relevant to the descriptive-use element of fair use; the court's earlier holding, which merely held that genuine disputes of fact exist, in no way treated that factor as "dispositive." What is more, the alternative terms available to Breitling, such as "rose gold," were not just adequate—they were *superior*. Breitling itself used the alternate and accurate term "rose gold" to identify products that it started calling "Red Gold" around 2010. Solid 21 showed, and certainly adduced ample evidence for any reasonable jury to find, that consumers of high-end watches do not understand "Red Gold" to describe

3

anything.  A jury readily could have found from this confluence of factors that Breitling was not using "Red Gold" descriptively.

Likewise, ample evidence could lead a jury to find that Breitling's adoption of "Red Gold" in 2010 was not in good faith.  Breitling bore the burden to prove good faith, but it produced no explanation for this adoption and admitted that it did not conduct a trademark search.  A jury could infer from *all* the evidence—including extensive media coverage of Aire and the RED GOLD® brand preceding 2010, Breitling's failure to explain its switch to "Red Gold," and the resulting consumer confusion—that Breitling sought to trade on the goodwill associated with the RED GOLD® mark.

To reverse, the Court must find triable issues of fact on only one element of the fair-use defense.  Triable issues of fact permeate all three elements. This Court should reverse and remand for a trial.

### A.    Statutory Background

The Lanham Act, 15 U.S.C. § 1051 *et seq.*, serves two principal goals. The Act "protect[s] the public so it may be confident that, in purchasing a product bearing a particular trade-mark which it favorably knows, it will get the product which it asks for and wants to get."  H.R. Rep. No. 79-219, at 2 (1945).   And it "secur[es] to the owner [of a mark] the good-will of his

business." *Id.* Trademarks thus are central to a manufacturer's identity and help consumers readily find their preferred brands.

1.    The Act defines a trademark in relevant part as any word, or any combination thereof, that identifies goods and distinguishes them from the goods of others. *See* 15 U.S.C. § 1127. A mark thus indicates the source of goods. *See id.* Trademark holders are not required to register their marks to obtain protectible rights in a mark. Trademark holders instead obtain rights in a mark by using the mark in commerce. *See id.*

The United States Patent and Trademark Office (USPTO) maintains two trademark registers: the principal and supplemental registers. 15 U.S.C. §§ 1052, 1091. A mark's eligibility for registration on one of these registers depends on its "distinctiveness"—*i.e.*, its capacity to distinguish goods and services. *U.S. Pat. & Trademark Off. v. Booking.com B.V.*, 140 S. Ct. 2298, 2302 (2020).

Courts categorize a mark's distinctiveness "on an increasing scale": "(1) generic; (2) descriptive; (3) suggestive; (4) arbitrary; or (5) fanciful." *Id.* Suggestive, arbitrary, or fanciful marks are "inherently distinctive," and thus may be placed on the primary register without any further showing by the applicant. *Id.*; *see* 15 U.S.C. § 1052.

"[D]escriptive" marks "describe[] the qualities or characteristics of a good or service." *Park 'N Fly, Inc. v. Dollar Park & Fly, Inc.*, 469 U.S. 189, 194 (1985). Descriptive marks are registrable on the primary register if they have acquired secondary meaning, which means that they are "distinctive of the applicant's goods in commerce" and connote a specific brand to consumers. 15 U.S.C. § 1052(f). If a descriptive mark has not yet acquired distinctiveness, but is still "capable of distinguishing" the markholder's goods or services, the mark is registrable on the supplemental register. *Id.* § 1091(a).

Generic marks—that is, "the generic name for the goods or services"— receive no protection under the Lanham Act. *Booking.com*, 140 S. Ct. at 2303. A generic term (for example, "wine") does nothing to distinguish one producer's goods from another. *Id.* Because generic terms receive no trademark protection, they are not registrable with the USPTO. *See id.*

Registration of a mark on the primary register provides prima facia evidence of ownership. 15 U.S.C. § 1057(b). Federal registration also prevents others from registering confusingly similar marks with the USPTO, grants the markholder nationwide priority in the mark, and allows markholders to stop imports of infringing goods. 15 U.S.C. §§ 1052(d), 1057(c), 1124.

Additionally, once a mark has been registered for five years, the mark will obtain incontestable status if the markholder files a sworn statement of continuous and exclusive use. *See* 15 U.S.C. § 1065. Incontestable marks are presumptively non-generic. *See Gruner + Jahr USA Publ'g v. Meredith Corp.*, 991 F.2d 1072, 1076 (2d Cir. 1993). Incontestability also forecloses any challenge to the mark on the ground that the mark is merely descriptive and lacks secondary meaning. *See Park 'N Fly*, 469 U.S. at 205. To cancel an incontestable mark, a challenger must demonstrate that the mark is generic and overcome the presumption to the contrary. 15 U.S.C. § 1065(4); *see Gruner + Jahr*, 991 F.2d at 1076.

2.    The Lanham Act provides two causes of action for trademark infringement. Under 15 U.S.C. § 1114(1), the owner of a registered mark may sue a defendant who uses a copy of the mark in connection with the sale or advertising of any goods in a way that is likely to cause confusion. Under 15 U.S.C. § 1125(a), an owner of a mark, whether registered or not, may bring a claim for unfair competition against a defendant who uses a mark in a way that is likely to cause confusion as to the origin or sponsorship of his goods. Under either cause of action, the plaintiff must demonstrate that (1) the mark is valid and legally protectable; (2) the plaintiff owns the mark; and (3) the defendant's

use of the mark to identify goods or services causes a likelihood of confusion. *See Time, Inc. v. Petersen Publ'g Co. L.L.C.*, 173 F.3d 113, 117 (2d Cir. 1999). Relevant considerations under the third prong of this test include (1) the strength of the trademark; (2) similarity of the marks; (3) proximity of the products and their competitiveness with one another; (4) evidence that the senior user may "bridge the gap" by developing a product for sale in the market of the alleged infringer's product; (5) evidence of actual consumer confusion; (6) evidence that the imitative mark was adopted in bad faith; (7) the respective quality of the products; and (8) consumer sophistication. *See Tiffany & Co. v. Costco Wholesale Corp.*, 971 F.3d 74, 84-85 (2d Cir. 2020).

The Lanham Act provides would-be infringers with an affirmative defense of fair use. *See* 15 U.S.C. § 1115(b)(4). This defense permits "use . . . of a term or device which is descriptive of and used fairly and in good faith only to describe the goods or services of such party, or their geographic origin." *Id.* In other words, the defense "permits use of a protected mark by others to describe certain aspects of the user's own goods." *EMI Catalogue P'ship v. Hill, Holliday, Connors, Cosmopulos Inc.*, 228 F.3d 56, 64 (2d Cir. 2000). To prevail on a fair-use defense, a defendant must prove that it used the plaintiff's mark

(1) other than as a trademark, (2) to describe its goods and services, and (3) in good faith. *Id.*

### B. Factual Background

1. At age 18, Chris Aire immigrated to the United States from Nigeria to get an education and build a life for himself.[1] After graduating from college and apprenticing for a jeweler, Aire launched his jewelry business with $5,000 of his own money.[2] Solid 21 sells luxury watches and jewelry that Aire designs. JA-3000.

In 1989, Aire began promoting and selling jewelry and watches under the RED GOLD® mark. *Id.* Aire's RED GOLD® products include elements of what Aire describes as "amber hue gold," also known as "rose gold." For example[3]:

---

[1] Mfonobong Nsehe, *Meet Chris Aire, the King of Bling and Jeweler to Hollywood's Elite*, Forbes (Apr. 13, 2015), https://bit.ly/3taaO36.

[2] Solid 21, Inc., *The Story Behind Chris Aire*, https://bit.ly/397TAMK.

[3] Solid 21, Inc., *Aire Parlay Automatic GMT Swiss Made 18 Karat Solid Gold Rare Watch – Red Gold®*, https://bit.ly/3GVMVlD.



Aire chose the term RED GOLD® as a brand to distinguish Solid 21's products and to appeal in particular to male clients. JA-3558; *see also* Solid 21, Inc., *supra* n. 2. He envisioned the word "red" in RED GOLD® as connoting masculinity. *Id.*

Aire's RED GOLD® collection dramatically expanded his business. Solid 21, Inc., *supra* n. 2. In 2002, Aire filed a trademark application for RED GOLD® with the USPTO, which registered the mark on the principal register in 2003. JA-52. In 2009, RED GOLD® achieved incontestable status under 15 U.S.C. § 1065. *See supra* p. 7.

Solid 21 launched an ambitious marketing campaign to expand RED GOLD®'s reach, advertising in magazines and promoting RED GOLD® in runway shows. JA-4562-4571; *see also* JA-4018-4028. In 2004, Aire made fashion history when he became the first jeweler to stage a runway show at New York Fashion Week. JA-3595; JA-4566; *see also* JA-3597 (reporting on Aire's second runway show at New York Fashion Week the following year); JA-4022-4023. The show was broadcast live on MTV; participants and attendees included supermodel Naomi Campbell, NBA star Vince Carter, musicians Wyclef Jean and Nelly, and tennis superstars Serena and Venus Williams. JA-4566; *see also* JA-4022.

The jewelry industry promptly took notice. In 2004 and 2005, *JCK Magazine*, a leading industry publication, reported on Aire and his "trademarked" "Red Gold." JA-2684; JA-2706. In 2006, in association with the World Gold Council, Aire presented a runway presentation entitled "RED GOLD® RUSH" at the annual JCK trade show in Las Vegas, a leading industry event. JA-4569; *see also* JA-4026. Grammy-winning artist Shaggy performed at the presentation. JA-4569; *see also* JA-4026.

Aire cultivated celebrity clients to wear his RED GOLD® pieces. He partnered with celebrities such as Muhammad Ali, Halle Berry, and Ellen

DeGeneres.  JA-3599; JA-3601; JA-4571; *see also* JA-4027.  For example, in partnership with Muhammad Ali, Aire created a custom piece of RED GOLD® jewelry to be auctioned to benefit the Muhammad Ali Parkinson Research Center:

RED GOLD® FOR GOOD.



Featured Muhammad Ali Boxing Gloves. One of kind 18k gold from Chris Aire Signature Red Gold® collection. Signed by the G.O.A.T Muhammad Ali himself, with a certificate of authenticity. This pair of boxing gloves are micro pave set with 7.00 carats of round brilliant VVS1 D-F color diamonds. All proceeds will benefit Muhammad Ali Parkinson Research Center. Truly a set to treasure.

JA-4572; *see also* JA-4029.  Celebrities such as Naomi Campbell modeled RED GOLD® on the runway.  JA-4566; *see also* JA-4029.  Other customers include Jamie Foxx, Michael Jordan, Justin Timberlake, Eva Longoria, Jay Z, Denzel Washington, Adrien Brody, and Madonna.  JA-2708; JA-3591; JA-3593; JA-3601; JA-4571; *see also* JA-4028.

Starting in 2002, Aire's jewelry and watches and the RED GOLD® brand were featured in nationwide publications such as *USA Today*, *Billboard*, and *Vibe*, and in industry publications such as *Modern Jeweler*,

*Rapaport Diamond Report*, *JCK Magazine*, *Jeweler's Quarterly*, and *International Watch*. JA-2706; JA-2718-2724; JA-2685; JA-3593; JA-3601; JA-3590-3591; JA-3597; JA-4562-4563; *see also* JA-4018-4019. Aire has advertised the RED GOLD® brand on CNN. JA-4565-4566; *see also* JA-4021-4022. Aire also has partnered with and/or been sponsored by organizations such as MTV, Diageo, and the World Gold Council. JA-3582; JA-4568; *see also* JA-4024.

Before 2017, Solid 21's RED GOLD® products were available at outlets such as Saks Fifth Avenue and Bailey Banks & Biddle. JA-4557; *see also* JA-4013. Today, Solid 21 continues to sell RED GOLD® watches and jewelry directly to customers. As a sign of his success, Aire is known to his clients as "The Iceman," JA-3601, and the "King of Bling," JA-2697; Nsehe, *supra* n. 1. Aire has expanded his marketing efforts to social media, with an active Instagram and Facebook presence. JA-3001-3002. Aire's Instagram page has 40,000 followers. *Id.* Aire uses the hashtag "#redgold" to promote the RED GOLD® brand across social media. *Id.*

2. After Aire's success developing and promoting his RED GOLD® brand, Breitling, a Swiss watch manufacturer, started using "Red Gold" to advertise its watches. JA-2992. Breitling first started using the term "Red Gold" to advertise its watches in approximately 2010, even though Breitling has been

selling watches since 1884.  JA-1170; JA-1172; JA-1248; JA-2606; *see also* JA-2795-2798.  Starting in 2010, Breitling advertised "Red Gold" watches on its website and in magazines such as *International Watch*.  JA-1248; JA-3615-3618; JA-3624.  As one example from Breitling's website:



JA-3624 (red outline added).  Breitling also marketed "Red Gold" on social media using #redgold alongside its own marks, such as #breitling and #navitimer:



JA-3626 (red outline added); *see also* JA-3627-3629.

In response to customer questions, Breitling representatives used the terms "red gold" and "rose gold" interchangeably. For example, one customer asked about "the difference between rose gold and red gold"; a Breitling employee responded that they are both "a rose gold color." JA-4720. Another customer asked if a watch came in both regular gold and rose gold; a Breitling employee responded (putting the term "red gold" in quotation marks) that the watch was "available only in 'red-gold' which is what we consider rose gold." JA-4718; *see also* JA-4722. Notably, Breitling even advertised the very same watch, identified by the same reference number (U17395211A1U1), as both "Red Gold" and "Rose Gold":



*Compare* JA-2605 ("Rose Gold") *with* JA-4681 ("Red Gold") (red outlines added).

Customers understandably became confused after Breitling started promoting "Red Gold" watches. Customers who saw Breitling's "Red Gold" watches asked Solid 21 if it had partnered with Breitling. JA-3621-3622; *see also* JA-3634; JA-3639; JA-3643; JA-3649; JA-3652-3653 (declarations from customers who saw "Red Gold" on other watch manufacturer's products and assumed it was a partnership with Solid 21).

## C. Procedural History

1. <u>Prior proceedings</u>. Alarmed about the threat to its RED GOLD® mark, in 2011 Solid 21 sued Breitling for trademark infringement in the U.S. District Court for the Central District of California. *See Solid 21 v. Breitling USA Inc.*, Case No. 11-cv-00457 (C.D. Cal. filed Jan. 14, 2011). Solid 21 claimed that Breitling infringed its RED GOLD® mark under the Lanham Act, among other claims. *See* 11-cv-00457, Dkt. No. 1. Breitling moved to dismiss the complaint, arguing that RED GOLD® was generic and that Breitling's use of the phrase "Red Gold" was fair use. *See* 11-cv-00457, Dkt. No. 7. The district court held that RED GOLD® was generic, but the Ninth Circuit reversed in 2013. *Solid 21, Inc. v. Breitling USA, Inc.*, 512 F. App'x 685 (9th Cir. 2013). The Ninth Circuit observed that RED GOLD®'s registration entitled the mark to a "strong presumption that the mark is not generic" that is "difficult to overcome, even at the summary judgment stage." *Id.* at 686 (internal quotation marks omitted). The Ninth Circuit found that the district court had thus erred in holding the mark generic on a motion to dismiss. *Id.* at 686-87.

On remand, the parties stipulated to voluntary dismissal and tolling of the statute of limitations pending the outcome of Solid 21's similar action

against watchmaker Hublot. *See* 11-cv-00457, Dkt. No. 45. In 2015, the district court presiding over the *Hublot* action ruled that the RED GOLD® mark was generic and granted summary judgment to Hublot. *Solid 21, Inc. v. Hublot of Am.*, 109 F. Supp. 3d 1313 (C.D. Cal. 2015). The Ninth Circuit again reversed. *Solid 21, Inc. v. Hublot of Am.*, 685 F. App'x 530 (9th Cir. 2017). The Ninth Circuit held that Solid 21's evidence, including customer declarations and expert evidence, "raised a triable issue of material fact concerning whether consumers understand 'red gold' to refer only to a particular producer's goods (in which case the term is not generic) or whether consumers understand the term to refer to the goods themselves (in which case the term is generic)." *Id.* at 532.

On remand, in 2018, Solid 21 settled its trademark claims against Hublot. As part of the settlement agreement, the parties released a public statement wherein Hublot recognized Solid 21's incontestable RED GOLD® mark and agreed to stop using "Red Gold." JA-3631.

2. <u>Current proceedings and Breitling's motion for summary judgment</u>. Solid 21 then initiated this action against Breitling in the U.S. District Court for the District of Connecticut on April 5, 2019. JA-34. Solid 21 brought claims for trademark infringement under the Lanham Act, 15 U.S.C. §§ 1114,

1125(a); unfair competition under the Lanham Act, *id.* § 1125(a); trademark dilution under the Lanham Act, *id.* § 1125(c); false description under the Lanham Act, *id.* § 1125(a); common-law trademark infringement; trademark dilution under Connecticut law, Conn. Gen. Stat. Ann. § 35-11i; and unfair competition and deceptive acts and practices under the Connecticut Unfair Trade Practices Act, Conn. Gen. Stat. Ann. § 42-110b.  JA-40-46.

Two months before the close of discovery, Breitling moved for summary judgment.  JA-4521.  With respect to the trademark-infringement and related claims, Breitling argued that RED GOLD® was generic and that Breitling's use of "Red Gold" was fair because it used the term in good faith to describe watches made of "Red Gold."  JA-4540, 4543-4546.  Solid 21 moved for an extension of time to respond to the motion until 30 days after the close of discovery, JA-18, but when the district court did not act on the motion, filed a preliminary opposition to Breitling's motion based on the then-existing record, JA-19.

The district court denied Breitling's motion in relevant part.[4]  JA-4547.

On genericness, the court found that genuine issues of material fact precluded

summary judgment.  JA-4541.  The court cited Solid 21's declarations from

"consumers and those in the watch and jewelry industry who understand 'Red

Gold' to be a brand rather than a generic term."  JA-4540.  The court also cited

the declarations of Solid 21's linguistics and survey experts as evidence that

"'Red Gold' is not a generic term for consumers in the watch and jewelry mar-

ket."  *Id.*  And the court noted the absence of the term "red gold" from all but

one authoritative American dictionary.  *Id.*  In short, the court found, the evi-

dence on genericness was "conflicting," and required a "trial . . . to resolve the

issue of genericness."  JA-4541.[5]

---

[4] The district court granted Breitling's motion for summary judgment on the
trademark-dilution claims, JA-4546-4547, which Solid 21 does not challenge on
appeal.

[5] On the issue of genericness, Breitling  cited to the USPTO's nonfinal action
in July 2020 denying Solid 21's application to register the phrase "SIGNA-
TURE RED GOLD."  *See* JA-2598.  USPTO observed in that nonfinal action
that [] "RED GOLD" is "merely descriptive of or generic for applicant's
goods," which led the agency to conclude that the word "SIGNATURE" was
"the more dominant element of the mark."  JA-2599.  Solid 21 responded to
the 2020 action with additional evidence that RED GOLD® is not generic.  In
a subsequent action, the agency stated that that "the wording 'red gold' is ar-
guably not generic."  *See* USPTO, *Office Action on Trademark Application
Serial No. 88263031*, at 1 (July 7, 2021), https://bit.ly/3x7Uouk.  Solid 21 later

On Breitling's affirmative defense of fair use, the court found that Breitling had satisfied the first element of the fair-use test—use other than as a mark—as a matter of law. JA-4543-4544. But the court held that genuine disputes of material fact on the remaining two elements—descriptive use and good faith—precluded summary judgment. JA-4544-4545. Although Breitling had identified some evidence that its use of "Red Gold" was descriptive, the court held that the availability of the alternative term "rose gold" presented a genuine issue of material fact. *Id.* Similarly, although Breitling had identified some evidence that it claimed showed its use of "Red Gold" in good faith, the court held that evidence that Breitling advertised in the same publication as Solid 21, *International Watch*, put Breitling at least on constructive notice of the mark and foreclosed summary judgment. JA-4545-4546.

Having denied Breitling's premature summary-judgment motion, the court denied as moot Solid 21's motion for an extension of time to respond to the motion. JA-30.

3. <u>Breitling's motion for reconsideration</u>. Breitling moved for reconsideration on its fair-use defense. JA-4646-4648. The court reversed itself,

---

withdrew the Signature Red Gold application. Solid 21's RED GOLD® registered mark retains its incontestable status.

holding on reconsideration that Breitling established fair use as a matter of law.  JA-4657.

Concerning the element of descriptive use, the court held that it had erred in treating the availability of alternate terms as "dispositive of whether Breitling has satisfied the second element of its fair use defense."  JA-4648-4649.  The court also noted that it had overlooked evidence that Breitling used the terms "red gold" and "rose gold" to describe watches that the court characterized as "different hues," rather than using the terms as alternatives.  JA-4653-4655.  Breitling, however, had not argued that those watches had different hues in its motion for summary judgment or motion for reconsideration.  *See id.*

The court also held that Breitling established good faith as a matter of law.  JA-4656.  According to the court, Breitling's first use of "Red Gold" preceded Solid 21's first use of "Red Gold" in *International Watch*, meaning that Breitling lacked constructive knowledge of RED GOLD®.  *Id.*

4.   <u>Solid 21's motion for reconsideration</u>.  Solid 21 then moved for reconsideration of the reconsideration order, attaching materials that Breitling had been compelled to produce only after Breitling had filed its initial summary-judgment motion, which were not previously before the court.  *See* JA-

4739-4740.  The district court denied that motion.  JA-4745.  The court noted that some of Solid 21's exhibits "call into question" the court's conclusion on reconsideration that Breitling deliberately used "red gold" and "rose gold" "to assign nuanced descriptors to slightly different hues of its products."  JA-4740.  But the court explained that it would have reached the same result even considering these exhibits, because the existence of alternative terms is not "essential to courts' findings regarding the descriptive use element of fair use within the Second Circuit."  *Id.* (internal quotation marks omitted).

The court acknowledged that Solid 21's evidence—in the form of customer service logs—showed that "there are inconsistencies between the ways some Breitling employees describe the colors of its products."  JA-4741.  The court also acknowledged Solid 21's evidence that Breitling had used the terms "Red Gold" and "Rose Gold" to describe the very same watch.  JA-4743-4744.  But the court held, as a matter of law, that "[t]he fact that Breitling has at times used an alternative term to describe a product does not mean that its use of the words comprising the mark to describe the product on other occasions is non-descriptive or in bad faith."  JA-4744.  The court thus denied reconsideration.

In a separate ruling, the court held that its ruling on the trademark-infringement claims disposed of all of Solid 21's remaining claims. JA-4750. The court then issued judgment in favor of Breitling. JA-4751. This appeal follows.

## SUMMARY OF ARGUMENT

A jury must decide whether Breitling's unexplained decision to start calling its watches "Red Gold" constitutes fair use. Fair use is "a fact-intensive analysis," *Kelly-Brown v. Winfrey*, 717 F.3d 295, 311 (2d Cir. 2013), that is "best left in the hands of the trier of fact," *EMI Catalogue P'ship v. Hill, Holliday, Connors, Cosmopulos Inc.*, 228 F.3d 56, 68 (2d Cir. 2000). The district court usurped the jury's role when it reversed itself, on Breitling's motion for reconsideration, on the elements of descriptive use and good faith. And the court likewise decided disputed issues of fact in its initial ruling in holding as a matter of law that Breitling had proved use other than as a mark.

I. Ample evidence shows that Breitling did not use "Red Gold" descriptively. The fact that there was *substantial* evidence on this point makes this a straightforward case. Highly relevant to whether use is descriptive is the availability of alternative terms. Here, alternative terms such as "rose gold" were not just *available*; Breitling used the terms "Rose Gold" and "Red

Gold" to identify the very same product. Moreover, Breitling representatives understood that "Red Gold" was a phrase that Breitling used in lieu of the commonly understood alternative term "rose gold." Solid 21's evidence also showed that consumers of watches and jewelry do not even understand "Red Gold" to describe anything. On this record, a jury could easily rule for Solid 21. A holding that this combination of factors precludes summary judgment on this specific record does not somehow render one factor "dispositive," as the district court incorrectly found in granting reconsideration. Because Breitling must prove every element of its fair-use defense, these disputes of fact on this one element require reversal.

II.     A jury also could find that Breitling acted in bad faith by using "Red Gold" to trade on the goodwill developed by Solid 21, independently requiring reversal. The district court held that as a matter of law Solid 21 could not prove Breitling's knowledge of the RED GOLD® mark because Breitling's use of "Red Gold" in 2010 preceded an advertisement by Solid 21 in *International Watch*. That analysis seriously misunderstood the relevant evidence as well as the burden of proof, and overlooked other evidence on which a jury could have relied. Even if the timing of one advertisement by Solid 21 favors Breitling, that fact cannot overcome at the summary-judgment stage all of the

evidence pointing the other way. Breitling failed to proffer any explanation for its adoption of the phrase "Red Gold" in 2010. That fact—combined with extensive media coverage of Aire and RED GOLD® preceding 2010, Breitling's failure to conduct a trademark search, the lack of a commonly understood meaning of "Red Gold" among consumers, and confusion resulting from Breitling's use of "Red Gold"—all could permit a reasonable jury to find that Breitling did not act in good faith.

III.  Finally, a jury could find that Breitling used "Red Gold" to attract attention—*i.e.*, as a mark. Disputes of fact on this element independently require reversal. In holding otherwise, the district court focused on Breitling's use of "Red Gold" underneath Breitling's own trademarks and alongside descriptive terms. But that kind of evidence is only "one of several considerations in a fact-intensive analysis." *See Kelly-Brown*, 717 F.3d at 311. A jury could find from all the evidence—including Breitling's frequent, wide-ranging use of "Red Gold" in advertising, its use of "#redgold" in social media, and the lack of a commonly understood meaning of the phrase "red gold"—that Breitling used the mark as a sub-brand to attract attention.

## STANDARD OF REVIEW

This Court reviews a grant of summary judgment *de novo*, resolving all disputes and drawing all inferences in favor of the nonmoving party. *Jones v. County of Suffolk*, 936 F.3d 108, 114 (2d Cir. 2019). Summary judgment should be granted "only where there are no genuine disputes concerning any material facts, and where the moving party is entitled to judgment as a matter of law," or in other words, where no reasonable jury could return a verdict for the non-moving party. *Id.* (internal quotation marks omitted).

## ARGUMENT

To prove fair use and thus avoid liability for trademark infringement, a defendant must prove three elements: that its use of the plaintiff's mark was (1) other than as a mark, (2) in a descriptive sense, and (3) in good faith. *See EMI Catalogue P'ship v. Hill, Holliday, Connors, Cosmopulos Inc.*, 228 F.3d 56, 64 (2d Cir. 2000); 15 U.S.C. § 1115(b)(4). Because fair use is an affirmative defense, the defendant bears the burden to prove each element. *See KP Permanent Make-Up, Inc. v. Lasting Impression I, Inc.*, 543 U.S. 111, 114 (2004). Thus, if Breitling failed to prove even one element of the fair-use defense as a matter of law, it was not entitled to summary judgment.

Whether a defendant is entitled to fair use is "a fact-intensive analysis," *Kelly-Brown v. Winfrey*, 717 F.3d 295, 311 (2d Cir. 2013), that requires "individualized consideration" of the infringing use in relation to each of the three elements, *JA Apparel Corp. v. Abboud*, 568 F.3d 390, 402 (2d Cir. 2009); *Tiffany & Co. v. Costco Wholesale Corp.*, 971 F.3d 74, 94 (2d Cir. 2020). This fact-intensive analysis is "best left in the hands of the trier of fact." *EMI Catalogue*, 228 F.3d at 68. District courts thus must exercise "caution" in granting summary-judgment motions in this context "because defendant's intent is at issue." *Id.* at 61; *see also Fortune Dynamic, Inc. v. Victoria's Secret Stores Brand Mgmt., Inc.*, 618 F.3d 1025, 1031 (9th Cir. 2010) (citing, in a fair-use case, "the well-established principle that because of the intensely factual nature of trademark disputes, summary judgment is generally disfavored" (alternation and internal quotation marks omitted)). Accordingly, this Court has frequently reversed decisions granting or denying the fair-use defense as a matter of law. *See EMI Catalogue*, 228 F.3d at 68; *Kelly-Brown*, 717 F.3d at 311, 313; *Tiffany & Co.*, 971 F.3d at 94.

The district court erred in holding that Breitling had proven fair use as a matter of law. The court initially held that genuine disputes of material fact on the elements of descriptive use and good faith precluded summary

judgment. That first holding was correct. In reversing itself, the court misconstrued the relevant inquiry and overlooked significant evidence undermining fair use and thus precluding summary judgment. The court also erred in its initial decision in holding that Breitling had proven the first element—use other than as a mark—as a matter of law. Although Solid 21 need only identify a genuine dispute of material fact on one element of the fair-use test to prevail at this stage, factual disputes abound on all three elements.

## I. GENUINE DISPUTES OF FACT REMAIN ON WHETHER BREITLING USED "RED GOLD" IN A DESCRIPTIVE SENSE

Ample evidence would permit a jury to find that Breitling did not use "Red Gold" in a descriptive sense. The descriptive meaning of "Red Gold" to consumers is virtually nonexistent. That is why Breitling has used the far more common alternative term, "rose gold," to describe its watches. Strikingly, Breitling produced no evidence that it had *ever* used the term "Red Gold" to describe its watches until after Solid 21 registered its mark and created its RED GOLD® brand. Breitling is not entitled to summary judgment on this record.

1. "Whether a phrase is descriptive refers to its tendency to describe the goods in question in a broad sense." *Tiffany & Co.*, 971 F.3d at 93. Typically, a word or phrase is used in its descriptive sense if it identifies "'a

characteristic of the goods[ ] such as size or quality.'" *Id.* (alteration in original) (quoting *Cosmetically Sealed Indus., Inc. v. Chesebrough-Pond's USA Co.*, 125 F.3d 28, 30 (2d Cir. 1997)). As a general matter under trademark law, "[t]he test of descriptiveness is the meaning attached to the designation by *prospective purchasers*." *Blisscraft of Hollywood v. United Plastics Co.*, 294 F.2d 694, 699 (2d Cir. 1961) (internal quotation marks omitted) (emphasis added); *see also* Restatement (Third) of Unfair Competition § 14 cmt. a (1995) ("If the descriptive meaning of a designation is generally unknown in the marketplace, it is likely to be perceived as an indication of source. A word is therefore descriptive only if a significant number of prospective purchasers are likely to understand its descriptive connotations.").

This Court has long held that "whether there are other terms available to describe the pertinent characteristic" is a factor in determining whether a term is used in its descriptive sense. *EMI Catalogue*, 228 F.3d at 65; *see also see also Abercrombie & Fitch Co. v. Hunting World, Inc.*, 537 F.2d 4, 11 (2d Cir. 1976) ("The English language has a wealth of synonyms and related words with which to describe the qualities which manufacturers may wish to claim for their products."). When alternative terms are available to describe a product or convey a message to consumers, one can infer that the defendant's "use

was more suggestive than descriptive." *Fortune Dynamic*, 618 F.3d at 1042; *see, e.g.*, *EMI Catalogue*, 228 F.3d at 65. By contrast, when a term is the "only precise way to describe" a product, as in the case of the term "Tiffany" to describe the Tiffany setting of a ring, a jury could more readily find use of the term to be descriptive. *Tiffany & Co.*, 971 F.3d at 93.

Similarly, "common usage" of a term may point to a defendant's use of the term being descriptive. *Kelly-Brown*, 717 F.3d at 311; *see, e.g.*, *Cosmetically Sealed*, 125 F.3d at 30 (holding that "Sealed with a Kiss!!" was a common phrase and therefore descriptive); *B & L Sales Assocs. v. H. Daroff & Sons, Inc.*, 421 F.2d 352, 354 (2d Cir. 1970) (holding that the "common" slang term "Come on Strong" was descriptive). Conversely, uncommon words or phrases are less likely to be descriptive because it is less likely that the average consumer would understand the word or phrase as illustrating a characteristic of the product. *See, e.g.*, *Kelly-Brown*, 717 F.3d at 311 (phrase "Own Your Power" "differs from the sort of phrase which courts usually find to be used descriptively").

Underlying these considerations is the fact that the fair-use defense is intended to prevent "monopolization" of descriptive "lexicon." *Fortune Dynamic*, 618 F.3d at 1042-43. The availability of the defense thus varies

depending on "the descriptive purity of the defendant's use and whether there are other words available to do the describing." *Id.* at 1041; *see also* Restatement (Third) of Unfair Competition § 28 cmt. c ("[T]he absence of alternative terms capable of adequately describing the pertinent characteristic is also relevant in assessing the commercial justification for the use and hence the scope of permissible fair use.").

This Court has held on similar facts that a genuine dispute of fact foreclosed a ruling as a matter of law that the defendant used a phrase in its descriptive sense. *See EMI Catalogue*, 228 F.3d at 68. In *EMI Catalogue*, the plaintiffs owned a trademark in the title of the Benny Goodman song "Sing, Sing, Sing (With a Swing)." *Id.* at 59. The defendant, a golf club manufacturer, commissioned a 30-second commercial with a stock swing-style song. *Id.* at 60. In the commercial, three golfers hit shots, followed by "Swing, Swing, Swing" in white letters. *Id.* This Court ruled that "Swing, Swing, Swing" was not necessarily descriptive of the actions the defendants hoped consumers would take with their golf clubs because alternative terms, such as the single word "swing," or "hit," "stroke," or "shot," would have served "equally well." *Id.* at 65.

Similarly, *Kelly-Brown v. Winfrey* held that the defendants' use of the trademarked phrase "Own Your Power" was not necessarily descriptive because the phrase "Own Your Power" was uncommon. 717 F.3d at 312. The plaintiff owned the mark "Own Your Power" and used it for her motivational services business. *Id.* at 299. The plaintiff alleged that the defendants, Oprah Winfrey and related media companies, infringed her mark by producing content using the phrase "Own Your Power" to promote the Oprah Winfrey Network (OWN). *Id.* at 300. This Court held that the defendants had not shown at that stage of the litigation that they used "Own Your Power" descriptively because the phrase was not in "common" or "popular usage." *Id.* at 311. It was not apparent that "Own Your Power" described any of the products on which it was used (such as magazines) because the average consumer would not perceive "Own Your Power" as describing a characteristic of the products. *Id.* at 312.

2. The record forecloses a finding that Breitling's use of "Red Gold" was descriptive as a matter of law. For starters, the record demonstrates that Breitling had at its disposal more-than-adequate alternatives to describe its products. Solid 21 produced evidence that Breitling previously used, and still uses, "rose gold" to describe its "Red Gold" watches. As discussed above,

Breitling has used the terms "Red Gold" and "Rose Gold" to identify the very same watch—providing proof positive that "rose gold" is an adequate alternative. JA-2605; JA-4681; *see supra* pp. 15-16. What is more, internal Breitling documents show employees using the terms "red gold" and "rose gold" interchangeably. JA-4718; JA-4720; JA-4722. Certainly, this is not a case where the term "Red Gold" is the "only precise way to describe" Breitling's watches. *See Tiffany & Co.*, 971 F.3d at 93. Like the alternative terms "hit" or "swing" in *EMI Catalogue*, a reasonable juror could conclude that the existence of an alternative term renders Breitling's use of "Red Gold" non-descriptive. *See* 228 F.3d at 65.

In granting reconsideration to Breitling, the district court highlighted the following two images of Breitling watches, one advertised as "Red Gold" and the other as "Rose Gold," as evidence that Breitling used the two terms to describe "different hues":



NAVITIMER AUTOMATIC 35
18k Red Gold - Mother-Of-Pearl

NAVITIMER AUTOMATIC 35
Stainless Steel & 18k Rose Gold - Mother-Of-Pearl
USD 8,800.00 ⓘ

JA-4653. Breitling had not conducted this hue comparison in either its motion for summary judgment or its motion for reconsideration. It is not at all clear that the court was correct to describe the watches as having "different hues." *Id.* The gold portions of the watches appear identical. But even if the court's unscientific hue analysis were correct, Solid 21's evidence that Breitling used the terms to describe the *same* watch creates a dispute of fact.

Additionally, the phrase "Red Gold" is not commonly used to describe watch materials to consumers. The best evidence of this is Breitling's utter failure to produce any evidence that it had ever marketed or even described its watches as "red gold" in its century-long existence until 2010 at the earliest—after Solid 21 had launched its RED GOLD® brand. *See* JA-1248; JA-

2793-2799.  In fact, Breitling produced almost no evidence that any competing manufacturer had marketed watches as "red gold" in the United States before Solid 21 used the term.  These facts, in and of themselves, should have defeated summary judgment.

Solid 21's evidence showed that the phrase "Red Gold" lacks a commonly understood descriptive meaning among consumers.  Solid 21 produced declarations from customers and participants in the luxury watch industry stating that they did not understand "red gold" to describe a material.  JA-3634; JA-3639; JA-3643; JA-3648; JA-3652.  One customer explained, for example:

> I do not understand "Red Gold" to be a material. . . .  Of the many watch purchases I have made, I have never gone to a retailer, or asked a clerk for, a watch that contains a "red gold" material as this does not exist as far as I know.  Nor does "red" accurately describe any color of gold I have ever seen.

JA-3634.  The former President of Piaget, Vice-President of Cartier, and Chairman of the American Watch Association likewise averred that through the 2000s (when Aire was building his brand), "'red gold was not known as a gold alloy used as a material for watch and jewelry components," but "[i]nstead, the commonly known terms were rose gold or pink gold."  JA-3648.

Solid 21's survey expert similarly opined that "'red gold' is not a term that is common or familiar to consumers in the jewelry and watch industry."

JA-3090; *see also* JA-4106. And the near absence of the phrase "red gold" from authoritative modern English dictionaries confirms its lack of a commonly understood meaning. *See* JA-3025; JA-3053. A search of modern authoritative dictionaries yielded only one entry (from the Oxford dictionaries) for "red gold," defined as "an alloy of gold and copper." JA-3025-3032. Elsewhere, the Oxford English Dictionary identified the phrase as "archaic." JA-3029.

Given all these facts, it is unsurprising that Breitling's internal records show customers asking whether there was a difference between red gold and rose gold and employees using the terms interchangeably. JA-4718; JA-4720; JA-4722. One record is particularly devastating to Breitling's claim that it uses "Red Gold" descriptively. A representative wrote that he or she told a customer that a certain watch "is only available in 'red-gold' which is what we consider rose gold." JA-4718. A jury could find that the representative put the term "red-gold"—but not "rose gold"—in quotation marks to reflect the company's understanding that "red gold," unlike "rose gold," is a brand and not merely a descriptive phrase.

Because Solid 21's evidence shows that "Red Gold" lacks a commonly understood descriptive meaning to consumers, and because more commonly understood alternatives were available to Breitling, a jury could readily

conclude that Breitling's use was not descriptive. *See, e.g.*, *Kelly-Brown*, 717 F.3d at 311-12.

To be sure, Breitling identified evidence (much of it archaic) of technical use of "red gold" in the metal industry to refer to a specific alloy of gold and copper, JA-112-117, and argued on the basis of that evidence that "red gold" has a descriptive meaning distinct from "rose gold" or "pink gold." Breitling leaned especially heavily on a standard promulgated by the International Standards Organization—ISO 8654, entitled "Jewellery – Colours of gold alloys – Definition, range of colours and designation"—which designates "red" (also known as "5N") as a "colour of gold." JA-3442; JA-3448. Breitling, however, produced no evidence that the United States has adopted this standard, that Breitling's watches include a gold alloy that correlates to this standard, or that consumers in the United States understand the designations in this standard (which, notably, do not include "rose gold") to describe watches. That a phrase has descriptive meaning to international "scientists"—here, metallurgists or even jewelry makers—does not prove that a defendant uses the phrase descriptively when it promotes its products to American consumers. *See Blisscraft of Hollywood*, 294 F.2d at 699.

Even if Breitling's evidence showed sporadic (and mostly dated) usage of the phrase "red gold" in advertisements, *see, e.g.*, JA-733-734 (1891 advertisement in *The Jewelers' Circular*); JA-953-955 (1939 advertisement in orchestra concert program), the evidence on this point was in conflict. Breitling may argue to the jury on remand that its evidence shows that consumers understand the phrase "Red Gold" as descriptive. On this record, a jury could reject that argument and hold that Breitling's adoption of "Red Gold" to refer to its products negates the element of descriptive use.

3.    In granting reconsideration, the district court concluded that it had improperly treated the existence of alternative terms as "dispositive" in its earlier order denying summary judgment. JA-4649-4650; JA-4653. To the extent the court meant that evidence of alternative terms *alone* cannot create a genuine issue of material fact on descriptiveness, the court misunderstood the record. Solid 21's argument does not turn solely on the existence of adequate alternative terms. Indeed, Solid 21's argument is not that "rose gold" (or "pink gold") is an *adequate* alternative for "red gold." Rather, "rose gold" is a *superior* alternative because it is a term that is commonly understood and in popular usage among consumers, and that Breitling itself used to identify its products. That Breitling chose a term that lacks a commonly understood

meaning, and eschewed the commonly understood term it (and competing manufacturers) had previously used to market products, is powerful proof that Breitling is not using "Red Gold" descriptively.

Moreover, Solid 21 does not argue that the existence of alternative terms is "dispositive" of fair use as a matter of law, nor did the district court's earlier ruling treat it that way. The existence of alternative terms is one piece of evidence among several that a factfinder must consider before deciding fair use. Because the defendant bears the burden to prove fair use, where obvious alternative terms exist, it will typically be difficult for a defendant to prove fair use as a matter of law. That fact does not render the existence of alternative terms "dispositive"; it simply reflects the reality that, as this Court has explained, the fair-use defense is a fact-intensive inquiry that does not usually lend itself to summary judgment. *See EMI Catalogue*, 228 F.3d at 61, 68.

In diminishing the importance of alternative terms, the district court overlooked this Court's instruction that "the scope of the fair use should be related to . . . whether there are other terms available to describe the pertinent characteristic." *Id* at 65.; *see also Fortune Dynamic*, 618 F.3d at 1041. The existence of alternative terms, combined with all the evidence discussed above,

more than sufficed to create a genuine issue of material fact as to whether Breitling's recent adoption of the phrase "Red Gold" was descriptive.

## II. GENUINE DISPUTES OF FACT REMAIN ON WHETHER BREITLING ACTED IN GOOD FAITH

The district court also erred in holding, on reconsideration, that good faith existed as a matter of law. The court artificially constricted its inquiry on reconsideration to whether Solid 21 could show that it advertised the RED GOLD® mark before 2010 in a publication in which Breitling also advertised. JA-4655-4656; JA-4742-4745. That inquiry improperly shifted the burden of proof to Solid 21 and disregarded substantial other evidence of a lack of good faith.

1. Lack of good faith is indicated by "the subsequent user's intent to trade on the good will of the trademark holder by creating confusion as to source or sponsorship." *Kelly-Brown*, 717 F.3d at 312 (citation omitted). "In analyzing whether a defendant has acted in bad faith, the question is whether the defendant attempted to exploit the good will and reputation of a senior user by adopting the mark with the intent to sow confusion between the two companies' products." *Tiffany & Co.*, 971 F.3d at 88 (internal quotation marks omitted). As with the other fair-use elements, "the defendant must carry the burden of explanation and persuasion." *Id.* As an issue of intent, good faith

"is singularly inappropriate for determination on summary judgment," *id.*, and "best left in the hands of the trier of fact," *EMI Catalogue*, 228 F.3d at 68.

When combined with other evidence of bad faith, evidence tending to show knowledge or a lack of diligence by the defendant can create a genuine issue of material fact. *Id.* at 67; *see, e.g.*, *Sports Auth., Inc. v. Prime Hosp. Corp.*, 89 F.3d 955, 964 (2d Cir. 1996) (holding a trial necessary on good faith when the defendant did not conduct a trademark search and continued using the mark despite notice from the plaintiff); *see also Fortune Dynamic*, 618 F.3d at 1043 (holding that a jury could construe the failure to investigate whether a term was trademarked "as evidence of bad faith"). Other evidence of bad faith includes "[t]he availability of other descriptive terms and a decision not to use one of those terms," *EMI Catalogue*, 228 F.3d at 67, and evidence "that the defendant sought to confuse consumers as to the source of the product,'" *Kelly-Brown*, 717 F.3d at 312 (quoting *EMI Catalogue*, 228 F.3d at 66); *see also KP Permanent Make-Up*, 543 U.S. at 123 (holding that consumer confusion is relevant "in assessing whether a defendant's use is objectively fair").

In *EMI Catalogue*, this Court held that summary judgment was inappropriate on the good-faith element when the plaintiff produced evidence of

alternative terms and prior knowledge of the mark. In that case, "[t]he availability of other descriptive terms and a decision not to use one of those terms" (such as "shot" or "hit"), coupled with evidence that the defendants knew about the trademarked song, created a genuine issue of material fact as to the defendants' intent. 228 F.3d at 67.

Similarly, the Third Circuit held that the availability of alternative descriptive terms, including a term that the defendant had previously used, created factual issues on good faith. *Inst. for Sci. Info., Inc. v. Gordon & Breach, Sci. Publishers, Inc.*, 931 F.2d 1002, 1009-10 (3d Cir. 1991). In that case, the defendant switched from using the phrase "the contents of current issues" to the plaintiff's trademarked phrase "current contents" to describe its scientific research journal. *Id.* at 1009. The Third Circuit held that the defendant's prior use of an adequate alternative term weighed against a finding of good faith. *Id.* at 1010; *see also Sierra On-Line, Inc. v. Phx. Software, Inc.*, 739 F.2d 1415, 1423 (9th Cir. 1984) (holding that the defendant's "choice of the phrase 'Hi-Res Adventure' when other phrases were available could indicate an intent to trade on [the plaintiff's] good will and product identity").

2. Breitling cannot prove good faith as a matter of law on this record. A jury could easily find that Breitling's use of "Red Gold" to identify its watches was intended to trade on Solid 21's good will.

As an initial matter, a jury could infer from all the evidence that Breitling had knowledge—actual or constructive—of Solid 21's mark. Breitling's failure to produce evidence that it had ever used the phrase "Red Gold" before Solid 21 built its RED GOLD® brand suggests strongly that Breitling knew of Solid 21's mark and intended to trade on its cachet. Why else did Breitling start using the term "Red Gold" around 2010 to identify products it used to identify as "rose gold"? Why else did Breitling start using around 2010 a phrase that consumers of luxury watches do not recognize as having a descriptive meaning but instead associate with Solid 21 and Aire? Breitling provided no answer to those key questions below. A jury could find knowledge from that fact alone.

That the parties advertised in the same magazine—*International Watch*—is additional evidence of constructive, even if not actual, knowledge. On reconsideration, the district court found this fact irrelevant because Breitling's first use of "Red Gold" occurred in 2010, "which preceded Solid 21's first advertisement in *International Watch*" in 2011. JA-4656. But the record

shows that *International Watch* featured Aire's watches as early as 2005. JA-3593 (story on Jamie Foxx wearing a Chris Aire watch during an appearance at the Screen Actors Guild awards). Although the 2005 *International Watch* feature did not identify Aire's RED GOLD® mark by name, it nonetheless constitutes evidence that the luxury watch industry was aware of Aire before Breitling started using "Red Gold."

More fundamentally, the evidence shows that the luxury watch industry was well aware of Aire *and* his RED GOLD® brand by 2010. Other publications, including industry publications familiar to Breitling, featured RED GOLD® as early as 2002. *See supra* pp. 12-13; *see, e.g.*, JA-2718 to JA-2724 (2004 *Modern Jeweler* article featuring numerous products from Aire's Red Gold collection); JA-3591 (2003 Billboard article featuring Aire's "Red Gold jewelry"); JA-3595 (2004 *Rapaport Diamond Report* article on Aire's New York fashion week runway show highlighting "Red Gold™"). Notably, *Modern Jeweler*—a publication that Breitling itself described below as an "industry-specific *widely distributed* magazine[]," JA-2848 (emphasis added)—published in 2004 a 7-page article about Aire, his celebrity clientele, and his "trademarked" "red gold." JA-2722.

As also described above, in 2006 Aire partnered with the World Gold Council to present his RED GOLD® jewelry and watches at a leading industry trade show. JA-4569; *see also* JA-4026. He presented the brand at New York Fashion Week. JA-3595; JA-4566; *see also* JA-4022. And *JCK Magazine*, another trade publication, featured Aire and the RED GOLD® brand in 2004 and 2005. JA-2684; JA-2706. In short, Aire was not an obscure watch maker, and RED GOLD® was not an obscure brand. A jury could infer from this record that his competitors, including Breitling, took notice of the mark's success.

Breitling's admitted failure to conduct a trademark search for RED GOLD® when it started using the term, *see* JA-4728, further proves a lack of good faith. *See Sports Auth., Inc.*, 89 F.3d at 964; *see also* 2 J. Thomas McCarthy, *McCarthy On Trademarks* § 11:49 (5th ed. 2017) ("[F]ailure to perform a trademark search can provide support for a conclusion that a large company's 'carelessness' in launching a new product made its use of a mark objectively unfair, depriving it of the classic fair use defense.").

As with the descriptive-use element, the availability of alternative terms weighs against good faith. Like the defendants in *EMI*, who could have used alternatives to "Swing, Swing, Swing," Breitling could have used "rose gold"

and "pink gold" to describe its "Red Gold" watches. *See EMI Catalogue*, 228 F.3d at 67. As already discussed, those terms, unlike "red gold," are in common usage and are easily understood by consumers. *See supra* p. 36. That Breitling previously used the term "rose gold" to describe its watches before switching to Solid 21's mark weighs even more heavily in Solid 21's favor. *See Gordon & Breach*, 931 F.2d at 1009-10.

The district court characterized the evidence that Breitling employees referred to "Red Gold" and "rose gold" interchangeably as proving Breitling's good faith. JA-4741. In doing so, the court improperly drew inferences in Breitling's favor. Even if a jury could view these facts as evidence of good faith, it could just as easily view these facts to support Solid 21. A jury could find that Breitling used the term "Red Gold" to trade on the goodwill associated with Solid 21's brand and, when customers asked for clarification, Breitling told them the truth: that it uses the brand name "Red Gold" to identify what most consumers know as "rose gold." *See, e.g.*, JA-4718 ("This watch is only available is 'red-gold' which is what we consider rose gold.").

Lastly, a jury could find that Solid 21's evidence of consumer confusion proves that Breitling acted in bad faith. JA-3621-3622; *see also* JA-3634; JA-3639; JA-3643; JA-3649; JA-3652-3653. Solid 21's customers mistakenly

believed that Breitling had partnered with Solid 21 when it saw "Red Gold" on Breitling watches. JA-3621-3622. That confusion was perfectly understandable, both because Breitling has partnered with other companies on co-branding initiatives[6] and because Solid 21 itself has partnered with other companies, *see supra* p. 13. A reasonable jury could find that Breitling was using the term "Red Gold" to imply a similar relationship with Solid 21.

In sum, abundant evidence could lead a jury to find that Breitling did not prove that it acted in good faith when it started using Solid 21's RED GOLD® mark to advertise and promote competing watches. Accordingly, the district court erred in granting summary judgment on this element of fair use.

## III. GENUINE DISPUTES OF FACT REMAIN ON WHETHER BREITLING USED "RED GOLD" AS A MARK

Finally, a jury could find that Breitling's repeated use of "Red Gold" to market its watches, including in its social media marketing, demonstrates that it is using "Red Gold" as a mark.

1. To determine whether a defendant uses a term as a mark, this Court asks whether the defendant used the term "as a symbol to attract public attention." *Abboud*, 568 F.3d at 400 (citation omitted); *Kelly-Brown*, 717 F.3d

---

[6] Breitling USA, *Partnership*, https://bit.ly/3GEk0SK; *see also* JA-4046 (describing Breitling's co-branding with Bentley).

at 306. In other words, the inquiry considers whether the defendant employs the mark to identify goods and to distinguish their source. *Tiffany & Co.*, 971 F.3d at 92. This inquiry is fact specific and considers aesthetic factors such as the term's typeface, size, and color. *See Abboud*, 568 F.3d at 402; *Tiffany & Co.*, 971 F.3d at 92-93.

Also relevant is how the defendant uses the term in conjunction with the defendant's own mark. *See Cosmetically Sealed*, 125 F.3d at 30-31. For example, a defendant's use of the plaintiff's mark as a subtitle under a defendant's mark can indicate that the defendant is not using the plaintiff's mark as a mark. *See Car-Freshner Corp. v. S.C. Johnson & Son, Inc.*, 70 F.3d 267, 270 (2d Cir. 1995). But "this fact [is] one of several considerations in a fact-intensive analysis." *Kelly-Brown*, 717 F.3d at 311. Because "established companies are allowed to seek trademarks in sub-brands," use of a plaintiff's mark as a subtitle does not necessarily exonerate a defendant. *Id.* at 308-09 (concluding that a jury could find that Oprah sought to use the phrase "Own Your Power" as a sub-brand within "the larger Oprah brand").

Other facts that this Court considers alongside the term's relationship to the defendant's own mark include the frequency of the defendant's use of the term. A term is more likely used as a mark when it is a recurring theme

or device, such as an advertising slogan, because "[t]he slogan or title becomes a symbolic identifier of a product or product line through repetition." *Id.* at 309, 310. Additionally, digital use of a term, such as in a domain name, can show that the use is as a mark. *See TCPIP Holding Co., Inc. v. Haar Commc'ns Inc.*, 244 F.3d 88, 104 (2d Cir. 2001).

*Kelly-Brown* is instructive. There, this Court held that the plaintiff had adequately alleged that the defendants used "Own Your Power" as a mark because that phrase denoted "a particular line of services and content within the larger Oprah brand." 717 F.3d at 309. This Court focused on the defendants' "wide-ranging and varied" repetition of "Own Your Power" throughout the product line, which created "an association in the minds of consumers between a slogan and a particular product." *Id.* at 309. Although "the defendant also displayed a different mark, such as Oprah's name . . . in close proximity," this fact "was one of several considerations in a fact-intensive analysis" and was not dispositive. *Id.* at 311. Indeed, this Court rejected the defendant's argument for a bright-line "rule that all use was other than 'as a mark' if the defendant also displayed a different mark . . . in close proximity." *Id.* In so doing, this Court distinguished its earlier decision in *Cosmetically Sealed*, which held that the defendant did not use "Seal it with a Kiss!!" as a mark because it did

not use the phrase on its product, the product's packaging, or "in any other advertising or promotional materials related to [the defendant's] product." *Id.* (quoting 125 F.3d at 31).

2. Here, a jury could find that Breitling used the term "Red Gold" to attract attention—*i.e.*, as a mark. Beginning around 2010 Breitling repeatedly used the term "Red Gold" in advertising and promotional materials to identify its watches. As in *Kelly-Brown*, Breitling's use of "Red Gold" was "wide-ranging and varied." *See id.* at 309. It spanned magazine advertisements, brochures, social media, and advertisements on Breitling's website. JA-1170; JA-1172; JA-1248; JA-2606; JA-2795-2798; JA-3615-3618; JA-3624; JA-3626-3629. And unlike the use of "Sealed with a Kiss!!" in a single advertising campaign in *Cosmetically Sealed*, Breitling uses "Red Gold" in "advertising [and] promotional materials related to" its watches. *See* 125 F.3d at 31.

Critically, Breitling promotes #redgold through social media. Solid 21 produced evidence that, in today's digital world, hashtags are key in attracting public attention and increasing brand awareness. JA-4033. And Breitling promotes #redgold *alongside* Breitling's other source identifiers, like #navitimer and #breitling—not as a subtitle *under* its source identifiers. JA-3626-3629; *see supra* p. 15. The district court incorrectly characterized the social media

posts as "a series of hashtags alongside other descriptors of the watch."  JA-4544.  While Breitling's social media posts did contain some descriptive hashtags, they also contained Breitling's marks.  One used the capitalized term "Red Gold" in the body of the posting alongside Breitling's mark:



JA-3628 (red outline added).  At a minimum, this evidence creates a triable issue as to whether Breitling used "Red Gold" as a mark.  As with use of a mark in a domain name, a jury could find that Breitling used the #redgold hashtag to identify source and thus as a mark.  *See TCPIP*, 244 F.3d at 104; *see also, e.g.*, *Pub. Impact, LLC v. Bos. Consulting Grp., Inc.*, 169 F. Supp. 3d 278, 295 (D. Mass. 2016) (holding the defendant's use of the plaintiffs' mark in social media hashtags was likely to confuse customers, especially because the parties were competitors).

The district court erred in holding that Breitling did not use "Red Gold" as a mark as a matter of law based solely on the positioning of "Red Gold" compared to Breitling's own marks. The court only considered evidence that on Breitling's advertisements "Red Gold" appears smaller than marks like "Navitimer" and instead appears alongside other descriptive terms. JA-4543. But this Court held that the relationship between the defendant's use of the plaintiff's mark and its own mark is not dispositive and is instead "one of several considerations in a fact-intensive analysis." *See Kelly-Brown*, 717 F.3d at 311. Other relevant considerations here include Breitling's use of the #redgold hashtag alongside its own marks, its repeated, widespread use of the capitalized term "Red Gold," and the fact that "red gold" lacks descriptive meaning to consumers. A reasonable jury could conclude on this record that Breitling was marketing "Red Gold" as a sub-brand. *See id.* at 308-09.

**CONCLUSION**

For the foregoing reasons, this Court should reverse the judgment of the district court and remand this case for trial.

Respectfully submitted,

/s/ Amy Mason Saharia

| | |
|---|---|
| DAVID L. HECHT | LISA S. BLATT |
| YI WEN WU | AMY MASON SAHARIA |
| HECHT PARTNERS LLP | WILLIAMS & CONNOLLY LLP |
| *125 Park Avenue, 25th Fl.* | *680 Maine Avenue S.W.* |
| *New York, NY 10017* | *Washington, DC 20024* |
| *(212) 851-6821* | *(202) 434-5000* |
| | *asaharia@wc.com* |

JUNE 3, 2022

## CERTIFICATE OF COMPLIANCE
## WITH TYPEFACE AND WORD-COUNT LIMITATIONS

I, Amy Mason Saharia, counsel for appellant and a member of the Bar of this Court, certify, pursuant to Federal Rule of Appellate Procedure 32(a)(7)(B) and Local Rule 32.1(a)(4), that the attached Brief of Appellant is proportionately spaced, has a typeface of 14 points or more, and contains 10,537 words.

JUNE 3, 2022                    /s/    *Amy Mason Saharia*
                               AMY MASON SAHARIA

## CERTIFICATE OF SERVICE

I, Amy Mason Saharia, counsel for appellant and a member of the Bar of this Court, certify that, on June 3, 2022, a copy of the attached Brief of Appellant was filed with the Clerk and served on the parties through the Court's electronic filing system. I further certify that all parties required to be served have been served.

JUNE 3, 2022

/s/ _Amy Mason Saharia_
AMY MASON SAHARIA

**STATUTORY ADDENDUM**

**TABLE OF CONTENTS**

15 U.S.C. § 1115 ....................................................................................................................3a

**15 U.S.C. § 1115. Registration on principal register as evidence of exclusive right to use mark; defenses**

**(a) Evidentiary value; defenses**

Any registration issued under the Act of March 3, 1881, or the Act of February 20, 1905, or of a mark registered on the principal register provided by this chapter and owned by a party to an action shall be admissible in evidence and shall be prima facie evidence of the validity of the registered mark and of the registration of the mark, of the registrant's ownership of the mark, and of the registrant's exclusive right to use the registered mark in commerce on or in connection with the goods or services specified in the registration subject to any conditions or limitations stated therein, but shall not preclude another person from proving any legal or equitable defense or defect, including those set forth in subsection (b) of this section, which might have been asserted if such mark had not been registered.

**(b) Incontestability; defenses**

To the extent that the right to use the registered mark has become incontestable under section 1065 of this title, the registration shall be conclusive evidence of the validity of the registered mark and of the registration of the mark, of the registrant's ownership of the mark, and of the registrant's exclusive right to use the registered mark in commerce. Such conclusive evidence shall relate to the exclusive right to use the mark on or in connection with the goods or services specified in the affidavit filed under the provisions of section 1065 of this title, or in the renewal application filed under the provisions of section 1059 of this title if the goods or services specified in the renewal are fewer in number, subject to any conditions or limitations in the registration or in such affidavit or renewal application. Such conclusive evidence of the right to use the registered mark shall be subject to proof of infringement as defined in section 1114 of this title, and shall be subject to the following defenses or defects:

(1) That the registration or the incontestable right to use the mark was obtained fraudulently; or

(2) That the mark has been abandoned by the registrant; or

(3) That the registered mark is being used by or with the permission of the registrant or a person in privity with the registrant, so as to misrepresent the source of the goods or services on or in connection with which the mark is used; or

(4) That the use of the name, term, or device charged to be an infringement is a use, otherwise than as a mark, of the party's individual name in his own business, or of the individual name of anyone in privity with such party, or of a term or device which is descriptive of and used fairly and in good faith only to describe the goods or services of such party, or their geographic origin; or

(5) That the mark whose use by a party is charged as an infringement was adopted without knowledge of the registrant's prior use and has been continuously used by such party or those in privity with him from a date prior to (A) the date of constructive use of the mark established pursuant to section 1057(c) of this title, (B) the registration of the mark under this chapter if the application for registration is filed before the effective

date of the Trademark Law Revision Act of 1988, or (C) publication of the registered mark under subsection (c) of section 1062 of this title: *Provided, however,* That this defense or defect shall apply only for the area in which such continuous prior use is proved; or

(6) That the mark whose use is charged as an infringement was registered and used prior to the registration under this chapter or publication under subsection (c) of section 1062 of this title of the registered mark of the registrant, and not abandoned: *Provided, however,* That this defense or defect shall apply only for the area in which the mark was used prior to such registration or Such publication of the registrant's mark; or

(7) That the mark has been or is being used to violate the antitrust laws of the United States; or

(8) That the mark is functional; or

(9) That equitable principles, including laches, estoppel, and acquiescence, are applicable.